**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-        (JKS) |
| Yuchen "Justin" Sun, and Polo Digital Assets LTD, | |
| Defendants. | |

**COMPLAINT**

Plaintiff PCT Litigation Trust ("PCT" or "Plaintiff")[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint") against Defendants Yuchen "Justin" Sun ("Sun") and Polo Digital Assets LTD ("Polo") (Sun and Polo are referred to collectively herein as, "Defendants"), pursuant to sections 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), seeking to avoid and recover all preferential transfers of property made by the Debtors to or for the benefit of Defendant plus interest, attorneys' fees, and costs. To the extent that Defendants filed proofs of claim or have claims listed by the Debtors on their schedules as

---

[1] The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2] The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

undisputed, liquidated, and not contingent, or have otherwise requested payment from the Debtors or the Debtors' estates (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by PCT herein as further stated in Count III below.  PCT alleges as follows:

## INTRODUCTION

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime on June 21, 2023, and Prime filed for bankruptcy shortly thereafter on August 14, 2023.  Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them.  But, in a series of transactions occurring between May 16, 2023 and the Petition Date,[3] Prime transferred $9,083,903.77 USD to Defendants (collectively, the "Transfers").

2.      After receiving the Transfers during the Preference Period, Defendants did not make any transfers of potential subsequent new value to Prime.  As a result, Defendants' preference exposure is no less than $9,083,903.77 USD.

3.      PCT brings this adversary proceeding (the "Adversary Proceeding") pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all preferential transfers of property and all obligations of Prime to or for the benefit of Defendants, made in the 90-day period

---

[3]     Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

prior to the filing of the Debtors' Chapter 11 Cases.  Pursuant to Section 502(d) of the Bankruptcy Code, PCT seeks to disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to PCT all property owed to it.

4.    Defendant Sun is one of the most prominent names in the crypto industry.  Sun is the founder of TRON, one of the most popular blockchain ecosystems in the world.  Sun owns and/or controls many companies operating in the crypto industry.  Defendant Polo, which operates the crypto exchange Poloniex, is one such company owned and/or controlled by Sun.

5.    Prime and Sun executed a Self-Directed Custodial Account Agreement (the "Sun Custodial Agreement") that governed Prime and Sun's relationship during the Preference Period.[4]

6.    Prime and Polo also executed a Self-Directed Custodial Account Agreement (the "Polo Custodial Agreement") that governed Prime and Polo's relationship during the Preference Period (the Sun Custodial Agreement and the Polo Custodial Agreement are referred to collectively herein as the "Custodial Agreements").[5]

7.    Although Prime was a Nevada state-chartered trust company, Defendants engaged Prime to provide custodial services.

8.    For example, the Custodial Agreements provided that Prime was to "act solely as custodian" of the fiat that Defendants transferred to Prime.  *See* Exs. A, B, Custodial Agreements, § 1.

9.    Additionally, the Custodial Agreements authorized Prime to "for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its

---

[4]    A copy of the Sun Custodial Agreement is attached as Exhibit A.

[5]    A copy of the Polo Custodial Agreement is attached as Exhibit B.  The Sun Agreement and the Polo Agreement are largely identical, including the relevant clauses cited in the Complaint.  As such, this Complaint cites to both the Sun Agreement and the Polo Agreement together.

nominee (commonly known as 'street name'), with [Defendants] ownership of Custodial Property segregated on its books and records." *Id.* § 4(b).

10.     The Custodial Agreements also authorized Prime to "hold the proceeds" derived from the fiat that Defendants transferred to Prime. *Id.* § 4(d).

11.     The Custodial Agreements establish that the parties always maintained a strictly debtor-creditor relationship and that no fiduciary relationship existed between the parties.

12.     In connection with Polo's purchase of Poloniex, Polo engaged Prime as escrow agent to custody the funds Polo used to make the purchase.  Polo and Prime executed a Transaction Escrow Services Agreement in connection with this transaction (the "<u>Escrow Agreement</u>").[6]

13.     All the fiat that Prime transferred to Defendants during the Preference Period was transferred from commingled "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled the fiat Defendants had originally transferred to Prime with fiat from Prime's many other customers and Prime's own fiat generated from its business operations.

14.     While $1,186,475.37 of the Transfers from Prime to Defendants was originally connected to an account associated with the Escrow Agreement, this $1,186,475.37 was commingled with other fiat in Prime's omnibus bank accounts before being transferred to Defendants during the Preference Period.  As such, it is impossible to specifically trace any of the fiat Defendants received through the Transfers to any of fiat that Defendants originally transferred to Prime.

15.     Prime attempted to keep track of commingled fiat transferred by Defendants (and other customers) with an internal, omnibus ledger (the "<u>Internal Ledger</u>").  But the Internal Ledger was errantly and later intentionally corrupted by Prime.

---

[6]    A copy of the Escrow Agreement is attached as <u>Exhibit C</u>.

16.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat that Defendants transferred to Prime.

17.     The third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat that Defendants transferred to Prime from fiat provided by Prime's other customers or from Prime's own fiat.  *See* Declaration of James P. Brennan (the "Brennan Decl.").[7]

18.     Bank account statements reflect that the fiat transferred from Prime to Defendants during the Preference Period was not the original fiat that Defendants had transferred to Prime. *See id*. at ¶ 71.  Rather, these transfers consisted of fiat from the commingled, omnibus bank accounts in Prime's name.

19.     In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[8] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.* at ¶¶ 46–47.

20.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.* at ¶¶ 48–53.

21.     Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was

---

[7]    A copy of the Brennan Decl. is attached as Exhibit D.

[8]    The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created

fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire

transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the

replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

> Q:    When it says funds transfer. . . and it says "wire, wire, wire."  Do you see
> that?
>
> A:    Yes.
>
> Q:    ***There were no wire transfers; right?***
>
> A:    ***Yes***.
>
> Q:    ***Just to be clear.  Yes, there were not any wire transfers in connection with
> these [Liquidity Provider] purchases; right?***
>
> A:    ***Yes, there were no wire transfers***.

Deposition of ██████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del.

Mar. 29, 2024) (the "███ Dep."), 164:22–165:10 (emphasis added).

22.    Prime's use of its fiat transferred by other customers to purchase replacement ETH

left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled

fiat from Defendants and other Prime customers.

23.    Prime's falsified wire transfer entries to cover its replacement ETH purchases,

coupled with Prime's failure to properly reconcile and record other transactions on its Internal

Ledger, have resulted in Prime being unable to trace any specific deposits, withdrawals, or

transfers that were made by any particular customer, including Defendants.  *See* Ex. D, Brennan

Decl., at ¶ 123–132.

24.     Prime's Transfers to Defendants during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

25.     The Transfers to Defendants during the Preference Period must be returned to the Debtors' estate pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.

26.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Defendants that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Defendants and, accordingly, reserves the right to amend this Complaint.

## PARTIES

27.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[9]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the

---

[9]     *See* Docket No. 694.

PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id*., § 1.118.

28.    Defendant Sun is a Chinese national and prominent crypto entrepreneur.  Upon information and belief, Sun resides in Singapore and/or Hong Kong.

29.    Defendant Polo is a company which was incorporated under the laws of, and operates from, the Republic of Seychelles.  Polo operates the crypto exchange Poloniex.  Upon information and belief, at all relevant times, Polo was owned and/or controlled by Sun.

## JURISDICTION AND VENUE

30.    The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."  *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."  *Id.*, §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

31.    This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C.  § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

32.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

33.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

34.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

35.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

36.     All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.   All transactions are recorded on the blockchain and are publicly available.   When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that

occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

37.     There are many different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Cryptocurrencies created on the Ethereum blockchain, are referred to as "ERC-20" tokens.

38.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

39.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

40.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

41.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

42.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer

device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

43.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



44.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept in the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

45.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-

executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.   Prime's Business Operations

46.    Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

47.    Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

48.    In the years that followed, as the crypto market grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

49.    Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

50.    Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

51.    Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

52.    Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

## II.    The Custodial Agreements Created a Strictly Debtor-Creditor Relationship Between Prime and Defendants

53.    Defendant Sun is a prominent figure and entrepreneur in the crypto industry.  Sun is the founder of TRON, one of the most popular blockchain ecosystems in the world.

54.    Sun owns and/or controls many companies that operate in the crypto industry.

55.    Defendant Polo is one such company owned and/or controlled by Sun.  Polo operates the crypto exchange Poloniex.

56.    In October 2019, Prime and Sun executed the Sun Custodial Agreement.

57.    In October 2019, Prime and Polo executed the Polo Custodial Agreement.[10]

58.    The Custodial Agreements governed Prime and Defendants' relationship during the Preference Period.

59.    At all relevant times, the Custodial Agreements were valid and enforceable contracts governed by Nevada law.  *See* Exs. A, B, Custodial Agreements § 18 ("This Agreement is governed by and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

60.    The Custodial Agreements provided that Defendants "appoint[ed] Prime Trust to be custodian and to hold or process as directed all securities, cash, and other assets of [Defendants] . . . that are delivered to and accepted by [Prime]." *Id.* § 1.

---

[10]    Prime and Polo also executed the Escrow Agreement in October 2019.

61.     Under the Custodial Agreements, Prime was to "act solely as custodian of the Custodial Property." *Id.* § 2(a).

62.     Moreover, the Custodial Agreements authorized Prime to "for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as 'street name'), with [Defendants] ownership of Custodial Property segregated on its books and records." *Id.* § 4(b).

63.     Finally, the Custodial Agreements authorized Prime to "hold the proceeds" derived from the maturity, redemption, or sale of the fiat Defendants transferred to Prime. *Id.* § 4(d).

64.     There is no language in the Custodial Agreements providing or in any way suggesting that Prime owed a fiduciary duty to Defendants.

65.     The Custodial Agreements also lack any terms that would suggest Prime held fiat in trust on behalf of Defendants.

66.     Accordingly, the Custodial Agreements established that the relationship between Prime and Defendants was strictly debtor-creditor.

## III.    Transfers From Prime to Defendants During the Preference Period Are Avoidable

67.     Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

68.     First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

69.     Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

70.     Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

71.     Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  *See* 11 U.S.C. § 547(b)(4).

72.     Fifth, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would have received in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  *See* 11 U.S.C. § 547(b)(5)(A)–(C).

73.     In March 2023, the United States Securities and Exchange Commission ("SEC") initiated a lawsuit against Sun in the United States District Court for the Southern District of New York which alleged that Sun had engaged in the unregistered offer and sale, manipulative trading, and unlawful touting of securities.

74.     In response to the SEC's action against Sun, Prime made the decision to terminate its relationship with Sun and any companies Prime served which were owned and/or controlled by Sun, such as Polo.

75.     On May 16, 2023, Prime terminated its relationship with the Defendants.

76.     The subsequent Transfers to Defendants—a result of Prime terminating the relationship due to the regulatory action and allegations against Sun—were not in the ordinary course of business between the parties.

77.     Prime transferred $9,083,903.77 USD from one of Prime's omnibus, commingled accounts at BMO Harris Bank, N.A. ("BMO") ending in 3077 ("BMO x3077) to or for the benefit of Defendants during the Preference Period.[11]  *See* Ex. D, Brennan Decl., at ¶¶ 66-67.

78.     Each of the Transfers from Prime to or for the benefit of Defendants was directed by Defendants based on a signed disbursement authorization from Defendants or the API log audit

---

[11]    The Prime entity which made the Transfers was Prime Trust, LLC.

data which establishes that Chi Chan Che, using the email address chichan.che@tron.network, directed the Transfers for or on behalf of Sun and Polo.[12]  *See id.* at ¶ 68.

79.    The Transfers to Defendants were transfers of an interest of Prime's property to or for the benefit of Defendants during the Preference Period.

80.    Prime executed the Transfers during the Preference Period to satisfy the debt Prime owed to Defendants.

81.    The Transfers were made while Prime was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[13]  If not avoided, the Transfers would enable Defendants to receive more than Defendants would have received on account of their claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers in satisfaction of Prime's antecedent debt owed to Defendants.[14]

82.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period performed by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid the Transfers even after taking into account Defendants' alleged affirmative defenses.[15]  Accordingly, the Transfers to Defendants must be returned.  *See* 11 U.S.C. §§ 547(b), 550.

---

[12]   One of the Transfers initiated for or on behalf of Defendants—consisting of the $1,186,475.37 associated with the Escrow Agreement—did not contain API log audit data but Prime records indicate that this transfer was initiated by Prime employees at the direction of Polo.  *See* Ex. D, Brennan Decl., at ¶ 69.

[13]   *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

[14]   *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

[15]   It is Defendants' obligation to establish any affirmative defenses it asserts in this action, including any subsequent new value and ordinary course of business defenses.

83.     Defendants did not transfer any potential subsequent new value to Prime after receiving the Transfers during the Preference Period.  *See* Ex. D, Brennan Decl., at ¶ 70. Therefore, Defendants' preference exposure is no less than $9,083,903.77.  *See id.*

84.     During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to Defendants during the Preference Period.  It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that was made to or for the benefit of Defendants or any other transferee.  PCT reserves its right to amend this original Complaint to include:  (i) further information regarding the Transfers; (ii) additional transfers; (iii) additional defendants; and/or (iv) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## IV.   The Transfers Contained Commingled Fiat

85.     The Transfers were comprised of commingled fiat from omnibus bank accounts.

86.     To complete the Transfers during the Preference Period, Prime transferred fiat from its omnibus, commingled BMO x3077 account.  *See* Ex. D, Brennan Decl., ¶ 67.

87.     Prime's extensive commingling of fiat eliminates any hope of Defendants being able to attribute any transfer of fiat originally from Defendants to Prime with the Transfers— including any funds associated with the Escrow Agreement.

88.     On July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting*

*Related Relief* [Docket No. 1086] (the "<u>Distribution Order</u>").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "<u>Distribution Opinion</u>").

89.    In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors were property of the Debtors' estates.  *See generally* Distribution Opinion.  Several parties (the "<u>Objectors</u>") objected to the Plan Administrator's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates.  *See id.* at 1–2.

90.    In overruling these objections, the Court made several findings pertinent to the instant matter.

91.    First, the Court held that the agreements "submitted into evidence [by the Objectors] do not establish a trust relationship exists" between Prime and its customers.  *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

92.    Similar to the Custodial Agreements here, the agreements analyzed in the Distribution Opinion also permitted Prime to hold fiat currency in accounts in Prime's own name and to hold proceeds derived from such fiat currency.  *See id.* at 24–25

93.    Second, the Court held that "[t]he case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified" and that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets."  *Id.* at 23–24.  The Court found that "the fiat held by the Debtors is not traceable" and "the hopeless commingling would not allow the cryptocurrency to be traced."  *Id.* at 27, 30.

94.    As set forth below, the Transfers from Prime to Defendants cannot be traced to Defendants' original fiat transfers to Prime.

**A.    Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name**

95.     The fiat Transfers from Prime to Defendants during the Preference Period were transferred from BMO x3077.  *See* <u>Ex. D</u>, Brennan Decl., at ¶ 67; *see also* <u>Ex. E</u>, Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "<u>BMO Agreement</u>").[16]

96.     Specifically, $7,897,428.40 of the Transfers associated with the Custodial Agreements was transferred from BMO x3077 to the Defendants.  $1,186,475.37 of the Transfers associated with the Escrow Agreement was also transferred from BMO x3077 to Defendants— meaning that any fiat Prime held "in escrow" on behalf of Defendants was commingled with fiat from Prime's other customers and with Prime's own corporate fiat before Prime made preferential transfers to Defendants during the Preference Period.

97.     The BMO Agreement specifically provides that it "***is not for the benefit of any other person and no other person shall have any rights against [Prime] or [BMO Harris] hereunder.***"  *See* <u>Ex. E</u>, BMO Agreement, § 15(e) (emphasis added).

98.     The BMO Agreement does not state that the fiat was held "in trust for" or "for the benefit of" any party other than Prime.  *See id.*

99.     Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."  *See* <u>Ex. F</u>, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "<u>BMO Certification</u>").[17]

100.    Prime regularly transferred fiat between its various bank accounts, further commingling funds. *See* <u>Ex. D</u>, Brennan Decl., ¶¶ 19–30.

---

[16]    A copy of the BMO Agreement is attached as <u>Exhibit E</u>.

[17]    A copy of the BMO Certification is attached as <u>Exhibit F</u>.

101.    For example, Prime used BMO x3077 primarily to make wire transfers.  *See id.* at ¶ 89.

102.    BMO x3077 held commingled funds that it regularly received from other Prime bank accounts and from Prime customers.  *See id.* at ¶¶ 21–26.

103.    At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[18]  *See id.* at ¶¶ 23–24.

104.    The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.* at ¶ 93.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *See id.*

105.    In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at Cross River Bank ("CRB") and Signature Bank ("Signature").  *See id.* at ¶ 24.

106.    Prime's accounts at CRB and Signature operated in a largely similar manner as BMO x3077—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers.  *See id.* at ¶ 25.

107.    For instance, CRB x4453 and CRB x9892 were omnibus bank accounts at CRB utilized by Prime.  *See id.* at ¶ 26.  These accounts were used primarily for internal transfers and payments via ACH.  Prime used BMO x3077, CRB x9892, or CRB x4453 depending on whether Prime needed to make transfers via wire or ACH.  *See id.*

---

[18]    BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit G § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts.  *See* Ex. F, BMO Certification.

108.    Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests. *See id.* at ¶¶ 19, 26.

109.    Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions. *See id.* at ¶ 29. This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity. *Id.*

110.    Prime would also transfer funds between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers. *See id.* at ¶ 18.

111.    Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger. *See id.* at ¶¶ 17–19.

112.    ▇▇▇▇▇▇▇▇ ("▇▇▇▇▇▇"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

> A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ▇▇▇▇▇▇▇, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▇▇▇▇ Dep."), 89: 19–25.

113.     However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.  *See* <u>Ex. D</u>, Brennan Decl., at ¶ 30.

**B.     Prime Had Inadequate Reconciliation Processes**

114.     Prime did not conduct regular, timely or accurate reconciliations to compare the fiat and the crypto recorded in its Internal Ledger with the fiat Prime actually held in omnibus bank accounts and crypto that Prime actually held in its Omnibus Digital Wallets.  *See id.* at ¶¶ 31–40. At least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id.* at ¶¶ 32, 33–38.  This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *See id.* at ¶¶ 27–40.

115.     Prime's own internal data also presents conflicting information regarding how certain digital wallets were attributed to different entities as well as falsified entries in Prime's Internal Ledger.  *See id.*

116.     Former Prime employees testified that Prime commingled fiat and crypto transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

117.     ▮▮▮▮▮▮▮ testified that "[r]econciliations were not being done in a timely manner." ▮▮▮▮ Dep., 38: 23–24.

118.     ▮▮▮▮▮▮▮▮ ("▮▮▮▮▮▮"), Prime's former Chief Financial Officer, testified:

Q:     Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:     I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

119.      ███████      also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been."  *See id.*, 213:15-22.

120.      ███████      ("███████"), Prime's former Senior Vice President of Operations and Reconciliations, also testified about Prime's reconciliations processes both before and after March 2021:

> Q:    When you say it was a problem, what do you mean?
>
> A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

███ Dep., 19:23–20:5.

121.      ███████      prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

| 2 | Finding and Response Summary Matrix | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Risk | Reference | Finding | Target | Response | Completed | Verified |
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

### C.    Defendants Cannot Trace the Fiat Originally Transferred to Prime

122.    Because Prime held assets transferred to it from customers in an omnibus, commingled manner, Prime's own employees were incapable of determining where any assets transferred by a particular customer to Prime was located.  As ▮▮▮▮▮▮ testified:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:    And what does that mean to you, a client to have an omnibus account?

A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:    And that was done at Prime Trust?

A:      It was done at Prime Trust.  It wasn't done very frequently, but there were—there were omnibus accounts at Prime Trust.

Q:      And do you know who was responsible for those accounts?

A:      I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

████ Dep., 205:19–207:3.

123.    Another example of the confusion in tracing specific assets that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



On Sat, Dec 17, 2022 at 11:16 AM ▮▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

▮▮▮▮

Do you know which banking account was used to see if we can determine what customer funds were utilized?

On Sat, Dec 17, 2022 at 2:12 PM ▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

All:
Yesterday I received another follow-up request from the NV FID and I'm requesting your assistance in preparing the response. ▮▮ is out of the office for a couple weeks so please send responses to me and cc him.

I have added names of the PT folks who I think are best suited to provide the information. If you think otherwise, please forward this request to the proper person and cc me and ▮▮▮▮

1. Regarding the User Agreement stated in the October 14, 2022 letter to the NFID, is this a disclosure on the website only or does every client sign acknowledgement of the User Agreement terms and conditions? - ▮▮
2. As stated in the letter, "the Company invested in additional Etherium using fiat currency from its omnibus accounts." Please provide a list of clients impacted from the investment and which omnibus accounts were utilized. - ▮▮
3. With the formation of the Executive Committee at the August 2, 2022 Board meeting, please provide Executive Committee minutes from the first meeting up through the most readily available minutes up to November 30, 2022. - ▮▮

Thanks for your help here.

--
▮▮▮▮▮
General Counsel
Prime Trust LLC
408-430-9109
primetrust.com
☒

124.        ▮▮▮▮▮▮ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

On Mon, Dec 19, 2022 at 9:28 AM ▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

Hey ▮▮▮▮,
Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

125.    ████████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat and crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":

> On Wed, Dec 28, 2022 at 10:56 AM ████████ @primetrust.com> wrote:
>
> ████ ████, and I met today.  We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure.  Please let us know if we need to have another conversation to align how to position this with the FID.

(Emphasis added).

126.    Because of Prime's commingling of fiat and poor recordkeeping procedures, it is impossible for PCT, Defendants, or anyone else to trace and specifically identify the fiat that Defendants originally had transferred to Prime, including any funds associated with the Escrow Agreement. *See* Ex. D, Brennan Decl., ¶¶ 28–44.

## V.    The 98f Wallet

### A.    Prime Discovers it has Lost Access to the 98f Wallet

127.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer of 5,867.71 ETH (worth approximately $24,000,000.00 at the time) from Prime. *See id.* at ¶¶ 46–47.  Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000.00 at the time). *See id.* at ¶ 50.

128.    In attempting to satisfy Abra's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its omnibus digital wallets:

> ████@primetrust.com
>
> 2021-12-22 07:16:57.000 PM
>
> Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @████ and @████ ████ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

129.    Further investigation revealed that, for approximately eight months, Abra had been transferring significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

130.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000.00 at the time) to the 98f Wallet.  *See* Ex. D, Brennan Decl., ¶ 47.

131.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.  *See id*. at ¶ 46.

132.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  *See* ████ Dep., 69:17–71:22.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ████ Dep., 181:6–8.  Prime also did not possess and could not locate the passwords, which are called "seed phrases," that were associated with these physical hardware devices connected to the 98f Wallet.  *See id*.

133.    As such, Prime had no way of accessing that wallet.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

### B.    Prime Uses Fiat From its Omnibus Bank Accounts to Purchase Replacement Crypto

134.    Prime was concerned about the negative impact and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a digital wallet containing a significant amount of crypto.

135.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below.  *See* Ex. D, Brennan Decl., ¶ 48.

136.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Abra's multiple outgoing transfer requests as reflected in the chart below.

| Date | USD Internal Ledger "Wire" Transfer[19] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250 |
| 1/6/2022 | $2,778,400 | 800 |
| 1/6/2022 | $7,293,300 | 2,100 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000 |
| 3/29/2022 | $7,902,800 | 2,300 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

*See id.* at ¶ 50.

137.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers.  *See id.* at ¶¶

---

19    Prime did not actually execute any of these wire transfers.  *See* ███ Dep, 164:22–165:10.

-29-

51–53.  The ETH purchased with those commingled funds was then transferred to Abra.  *See id.*
at ¶ 53.

138.    The decision to use this commingled fiat to fund Prime's purchase of replacement
ETH from Liquidity Provider was described by ██████, Prime's former Chief Operating
Officer, at his deposition:

> Q:    So [Customer's] depositing into a wallet that you don't have access to and
> is requesting withdrawals.  Prime funds those withdrawals.  How does it do
> it?
>
> A:    I would defer to ███ on that.  But essentially it was use of omnibus funds,
> is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus
> accounts, meaning fiat accounts and crypto accounts, crypto wallets that had
> basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the
> transactions?
>
> A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding.
> Once again, ███ would know specifically.

Deposition of ██████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov.
10, 2023), 92:25–93:18.

139.    The ETH that Abra had initially transferred to Prime was (and still is to this day)
locked away in the 98f Wallet.  *See* Ex. D, Brennan Decl., at ¶ 53.

**C.      Prime Corrupts and Falsifies its Internal Ledger in an Attempt to Conceal its
Use of the Omnibus Fiat**

140.    Executives at Prime made the decision to falsify entries in the Internal Ledger to
conceal the fact that Prime had used fiat from omnibus bank accounts to satisfy Abra's outgoing
transfer requests.  *See id.* at ¶ 54.

141.    ████████ confirmed in his deposition that Prime executives intentionally chose to settle and record ETH purchases from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to Liquidity Provider. *See* ██ Dep., 153:8–13.

142.    These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts. *See* Ex. D, Brennan Decl., at ¶ 58.

| | |
|---|---|
| ██@primetrust.com | 2021-12-23 03:40:01.000 AM |
| If we don't credit our ledger to settle, our bank account is plus the difference compared to the bank | |
| ██@primetrust.com | 2021-12-23 03:42:16.000 AM |
| The difference is are we okay with inflating our ledger vs having our bank account be out the difference compared to our ledger | |
| ██@primetrust.com | 2021-12-23 03:44:15.000 AM |
| Whatever you think is easier to reconcile once we get access to the locked ETH | |

143.    ████████ further testified about Prime's "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q:    [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:    Correct. Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:    Correct . . .

Q:    I see. But the [l]edger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.

█████ Dep., 144:11–20; 146:7–15.

144.    Desperate to hide the hole in its balance sheet, Prime executives discussed how to hide these transactions from auditors at Nevada FID:



145.    As demonstrated by the illustrative chart below,[20] Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

---

[20]    This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

146.    None of these wire transfers appear on Prime's bank account statements because they did not actually occur.[21]  *See* Ex. D, Brennan Decl., at ¶¶ 60–62.

147.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.  *See id.* at ¶ 63.

## VI.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

148.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

---

[21]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as Exhibit H.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as Exhibit I.

149.     At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

150.     On May 25, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

151.     Prior to May 25, 2023, documentary evidence reflects that Prime's CEO had been relaying to other market participants Prime's bleak financial condition and the likelihood that Nevada FID would shut them down.

152.     During the lead up to the May 25, 2023 meeting with Nevada FID and shortly thereafter, in response to confirmed rumors of Prime's financial condition, many of the industry's largest market participants were demanding transfers from Prime.

153.     For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

154.     On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals."  *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21,

2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits.  *Id.*

155.   The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business."  *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

156.   On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court").  *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.   The Nevada FID Petition directed Prime to cease and desist all retail trust activities.  *Id.*

157.   The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

158.   Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***."  *Id.* at 6 (emphasis added).

-35-

159.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

160.    On July 14, 2023, the Nevada Court placed Prime under receivership.

161.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfers,
### 11 U.S.C. § 547(b)

162.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

163.    The Transfers were made on account of a demand by Defendants.

164.    Each of the Transfers was a transfer of an interest in property of Prime.

165.    Prime made the Transfers to or for the benefit of Defendants.

166.    At the time of the Transfers, Defendants were creditors of Prime within the meaning of section 101(10) of the Bankruptcy Code.  Defendants received the Transfers, or, alternatively, the Transfers were made for Defendants' benefit.

167.    Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

168.    Each of the Transfers was made within ninety days of the Petition Date

169.   At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Transfers would enable Defendants to receive more than Defendants would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

170.   Defendants have not repaid or returned any of the Transfers to PCT.

171.   Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Defendants could assert, including Defendants' potential defenses under section 547(c) of the Bankruptcy Code, and believes that the Transfers are avoidable.

172.   Accordingly, PCT is entitled to recover from Defendants no less than $9,083,903.77 of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

## Count II
### Recovery of Avoided Transfers from the Defendants,
### 11 U.S.C. § 550

173.   PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

174.   PCT is entitled to avoid preferential transfers described above pursuant to section 547(b) of the Bankruptcy Code.  Defendants were the initial transferees of such transfer, or the immediate or mediate transferees of such initial transferee, or the persons for whose benefit such transfer was made.

175.   Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Defendants no less than $9,083,903.77 of the Transfers as preferences pursuant to

section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**Count III**
**Claim Objection, 11 U.S.C. § 502**

176.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

177.    As alleged above, Defendants were the initial transferees of the Transfers, or the immediate or mediate transferees of such initial transferee, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to Section 547(b) of the Bankruptcy Code, which are recoverable from Defendants under Section 550 of the Bankruptcy Code.

178.    Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Defendants that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Defendants pay PCT the value of the Transfers, for which and to the extent that the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.      Enter an order finding that the Transfers addressed herein are avoidable preferential transfers under 11 U.S.C. § 547;

B.      Award PCT:  (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to Defendants;

C.      Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Defendants against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Defendants relinquish to PCT the amount ordered as an award for avoidable transfers;

D.      Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.      Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated:  August 12, 2025
        Wilmington, Delaware

**MᴄDᴇRMOTT WILL & SᴄHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
dazman@mwe.com
jbevans@mwe.com
jpardo@mwe.com
ggriffith@mwe.com
pkennedy@mwe.com
jaminov@mwe.com
mduque@mwe.com

*Counsel to PCT Litigation Trust*